# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **Criminal Case No.: SAG-21-00391** |
| | * | |
| **DAVON JOHNSON** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On September 29, 2021, a grand jury returned an indictment against Davon Johnson, charging three counts arising out of the discovery of narcotics and a firearm on his person on March 29, 2021 in Baltimore City, Maryland. ECF 1. Mr. Johnson has filed a Motion to Suppress Tangible Evidence. ECF 40. This Court has considered the motion, related briefing, ECF 44, 46, the evidence presented, and arguments made by counsel at an evidentiary hearing held on February 1, 2023 and February 3, 2023. For the reasons that follow, Mr. Johnson's motion will be denied.

### I.    FACTUAL BACKGROUND

At or around 7:00 PM on March 29, 2021, Mr. Johnson stood at the 500 block of Richwood Avenue, near the intersection with York Road in Baltimore City. He was with a group of individuals, including a juvenile known as "Ty,"[1] standing around a parked sedan with a female friend in the driver's seat. Mr. Johnson testified that he had just returned from walking to a nearby carry out restaurant, a gas station, and a liquor store with Ty and a friend's younger sister.

---

[1] Given this individual was a juvenile at the time of Mr. Johnson's arrest, the Court will only refer to him by this nickname, which is not his real name.

At this same moment, then-Officer Randolph Perrin[2] was driving southbound in a marked patrol car on York Road, a four-lane road. Then-Officer (now-Detective) Dylan Burke followed behind Officer Perrin in a separate marked patrol vehicle. The two officers were driving to investigate an individual with an outstanding warrant in a neighborhood further south. The officers testified that they were being "proactive" in their duties and working to achieve a promotion. Officer Perrin's body-worn camera footage shows that he was texting with two hands while driving.

Officer Perrin testified that he was familiar through instruction from supervisors that this specific area suffered from high rates of homicides, carjackings, and controlled dangerous substance ("CDS") transactions.[3] As Officer Perrin passed the 500 block of Richwood Avenue on his left, he testified that he saw the group of individuals and observed a "suspected" hand-to-hand drug transaction from Mr. Johnson to Ty. Specifically, he testified that he observed Mr. Johnson hold a black bag with his left hand, "dip" his right hand into the black bag, and then give something from the bag to Ty. Officer Perrin did not observe the item passed between them, however, he testified that Mr. Johnson moved in a "clandestine" manner, as if attempting to hide his actions. At that time, Officer Perrin did not know Mr. Johnson, but he was familiar with Ty and knew that

---

[2] Mr. Perrin later became a Detective, but he is currently suspended from the Baltimore Police Department without pay because of pending criminal charges unrelated to this case. Given he was an officer at the time of Mr. Johnson's arrest, this Court will refer to him as "Officer Perrin" throughout the opinion.

[3] Mr. Johnson and the Government stipulated to the fact that the Baltimore Police Department designated the immediate area surrounding this specific block as part of a "Micro Zone," *i.e.*, "focused patrol areas" that represent "where the levels of [gun-related] crimes have been the highest." *See* BALTIMORE POLICE DEPARTMENT CRIME REDUCTION STRATEGY at 5 (June 2019), https://www.baltimorepolice.org/sites/default/files/General%20Website%20PDFs/BPD_Crime_Reduction_Plan.pdf.

Ty had a history of engaging in CDS transactions. Detective Burke testified that he did not see the group of individuals or witness any suspected hand-to-hand drug transaction; however, he did testify that he saw Officer Perrin "perk up" while driving past the intersection and immediately start to turn his vehicle.

Officer body-worn camera footage documents the remainder of the incident. Officer Perrin quickly made a U-turn and parked along York Road at the corner of York Road and Richwood Avenue. Then-Officer Burke followed suit, also making a U-turn and parking behind Officer Perrin's vehicle, although he was unsure about the reason for the detour. Officer Perrin got out of his car and quickly headed in the direction of the group. He testified that he immediately gave pursuit to Mr. Johnson because he was the individual of interest.

At this point, the group of individuals casually dispersed; however, Mr. Johnson began running down Richwood Avenue, away from Officer Perrin. Mr. Johnson was the only individual who fled. Officer Perrin pursued Mr. Johnson and ran straight past Ty. As seen on the video, Ty was walking towards Officer Perrin, cupping something in his left hand that he did not attempt to shield from the officer's view. The contents in Ty's hand are not visible from the body camera footage, and Officer Perrin did not observe what Ty was holding.

Officer Perrin chased Mr. Johnson down the street, shouting at him to "come here." Once he caught up with Mr. Johnson towards the end of the block, Officer Perrin placed his hand on Mr. Johnson, grabbing the front of his jean jacket and telling him to "stop." He then released Mr. Johnson and instructed him to "get on the ground." After Mr. Johnson did not comply, Officer Perrin placed his left hand again on his jean jacket and repeated the instruction to get on the ground. Mr. Johnson continued to not comply and questioned why Officer Perrin chased him, to which Officer Perrin did not respond. Then-Officer Burke arrived and assisted in holding Mr. Johnson

while Officer Perrin attempted to handcuff him. Officer Perrin testified that he did not intend to arrest Mr. Johnson at this point, but simply wanted to question him. He further testified that he had to handcuff Mr. Johnson for officer safety and to effect the investigatory stop. Mr. Johnson continued to resist being handcuffed, resulting in both officers working together to try and restrain him. While the two officers attempted to get handcuffs on Mr. Johnson, some of the individuals from the group began to approach. One male in a blue jacket yelled at the officers and came within touching distance of the officers and Mr. Johnson. Officer Perrin repeatedly attempted to keep this individual back, holding out his left hand and instructing him to get back, while simultaneously attempting to restrain Mr. Johnson. The bystander ignored this instruction, and eventually got close enough to grab a black plastic bag protruding from Mr. Johnson's left jean jacket pocket. As a result of the bystander's intervention, the contents of the bag—vials and gel capsules of narcotics—spilled out over the street and into plain view.

Some of the civilians watching the incident began picking up the capsules, while the two officers continued to attempt to handcuff Mr. Johnson. At this point, with probable cause to arrest Mr. Johnson, then-Officer Burke used a leg sweep and pressure point force to place him in handcuffs.

Other officers eventually arrived on scene. A few minutes later, the other officers searched Mr. Johnson and found a loaded firearm in a bag inside the front of his jacket. As the officers were handling the scene, cleaning up capsules from the ground, and awaiting transport for Mr. Johnson, Officer Perrin can be heard telling his sergeant, "I want Ty—that's who he was giving it to," referring to Mr. Johnson as the actor. In total, officers recovered capsules and bags of fentanyl, 69 vials of cocaine, a loaded firearm, and $681 found on Mr. Johnson's person. ECF 44 at 11.

Mr. Johnson asserts that Officer Perrin unlawfully arrested him without probable cause prior to discovering the contents of the bag, or in the alternative, that Officer Perrin lacked reasonable suspicion to detain him. Thus, Mr. Johnson seeks to suppress all evidence seized on March 29, 2021.

## II.   DISCUSSION

### A.   Moment of Mr. Johnson's Arrest

Mr. Johnson and the Government disagree about the precise moment Officer Perrin arrested Mr. Johnson and therefore required probable cause.

"The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.'" *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). "'Whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person,' and the Fourth Amendment requires that the seizure be 'reasonable.'" *Brignoni-Ponce*, 422 U.S. at 878 (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)).

Mr. Johnson asserts that Officer Perrin seized him once he grabbed his jacket and first placed a handcuff on him, and that this constituted an arrest because a reasonable person would not have felt free to leave.[4] ECF 46 at 20–22. In contrast, the Government argues that this encounter remained an investigatory stop until the moment the officers observed the illegal narcotics dumped on the street in plain view. ECF 44 at 16. The Government argues that Officer

---

[4] Mr. Johnson also cites to Baltimore Police Department ("BPD") policies purportedly defining "arrest." This Court's constitutional analysis is not dictated by BPD policies but by binding precedent.

Perrin's use of force, *i.e.*, placing his hand on his jacket and using handcuffs, was necessary to effect the investigatory stop and maintain the status quo. *Id.*

Officer Perrin clearly seized Mr. Johnson before the narcotics were discovered. He placed his hand on his jacket, instructed him to sit down, and placed handcuffs on him—a reasonable person would not feel free to leave under these circumstances. Thus, the reasonableness of this seizure must be analyzed under the Fourth Amendment. *Brignoni-Ponce*, 422 U.S. at 878. The use of force by an officer on its own does not automatically transform an investigatory stop into an arrest. "It is well established in [the Fourth C]ircuit that 'handcuffing a suspect . . . does not necessarily elevate a lawful *Terry* stop into a custodial arrest.'" *United States v. Ruffin*, 814 F. App'x 741, 749 (4th Cir. 2020) (quoting *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) (internal quotation marks omitted)). "This is because '[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances.'" *Id.* (quoting *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989). "In particular, the reasonableness of handcuffing a suspect during a *Terry* stop depends on whether doing so is 'necessary to maintain the status quo and protect officer safety.'" *Id.*

Here, given Mr. Johnson's flight and non-compliance with Officer Perrin's commands, the officers were justified in placing their hands on Mr. Johnson, instructing him to sit down, and attempting to handcuff him in the course of the investigatory stop. An investigatory stop must "be no more intrusive than is necessary to confirm or dispel the seizing officer's suspicions," *United States v. Lesane*, 498 F. App'x 363, 366 (4th Cir. 2012), and here, the officers' actions were necessary to question Mr. Johnson about the suspected narcotics transaction. Additionally, the Fourth Circuit has deemed comparable amounts of force reasonable to effect an investigatory stop

in similar situations. *See, e.g.*, *Ruffin*, 814 F. App'x at 749 (concluding an investigatory stop did not transform into a "full-blown arrest" even when the officer grabbed the defendant's arm, told him he was being detained, and tried to place handcuffs on him, *id.* at 747); *see also Lesane*, 498 F. App'x at 366 ("the five-minute period during which he was handcuffed before his attempted flight was clearly not longer than necessary for the officers to confirm or dispel their suspicion that [the defendant] might be involved in the distribution of narcotics"). Thus, Officers Perrin and Burke used only a justifiable amount of force to effect an investigatory stop and did not place Mr. Johnson under arrest until after the narcotics became visible.

### B.  Credibility of Officer Perrin

Much of Officer Perrin's reasonable suspicion for the investigatory stop derived from his observation of a suspected hand-to-hand drug transaction between Mr. Johnson and Ty, for which there is no body-worn camera footage. Mr. Johnson argues that this Court should discredit Officer Perrin's testimony, citing (1) Officer Perrin's troubled record with the Baltimore Police Department, (2) physical impediments to Officer Perrin's ability to witness any such transaction, and (3) his own contrary testimony about the evening in question. Upon reviewing the evidence and testimony, this Court finds Officer Perrin's testimony credible for several reasons.

First, Officer Perrin's testimony is consistent with the video evidence from his body-worn camera. He testifies that as he was driving south on York Road, he observed two individuals standing by a fence on Richwood Avenue: one whom he recognized as the juvenile "Ty," and one he later identified as the Defendant, Mr. Johnson. He testifies that he saw a suspected hand-to-hand drug transaction from Mr. Johnson to Ty. Specifically, Officer Perrin describes having seen Mr. Johnson, against a fence, holding a black bag in his left hand, dipping his right hand into the bag, and then giving something to Ty. From the body-worn camera footage, Mr. Johnson and Ty

were standing on Richwood Avenue, Mr. Johnson did have a black bag in his left pocket, and there was a fence near where the two individuals were standing. Overall, the video evidence of Officer Perrin's body-worn camera footage does not contradict the details of his testimony.

Second, Officer Perrin's testimony is restrained in scope. He admits to not having seen the object transferred from Mr. Johnson to Ty. He also admits he did not witness Ty give anything to Mr. Johnson in return, such as money.

Third, Officer Perrin's immediate response was consistent with his having witnessed a suspected CDS transaction. Although Officer Perrin had another destination at the time, he made an immediate U-turn after passing Richwood Avenue and jumped out of the car. Detective Burke, who was following Officer Perrin in a separate car, recalls seeing Officer Perrin "perk up" while driving by the Richwood Avenue intersection. These immediate responses corroborate that Officer Perrin witnessed something substantial enough to redirect his attention and pursuit.

Fourth, Officer Perrin's actions after jumping out of the car are consistent with him having seen Mr. Johnson pass something to Ty. For one, once out of the car, he ran past Ty and immediately gave pursuit to Mr. Johnson. Officer Perrin knew Ty was associated with CDS distribution, but had no prior knowledge of Mr. Johnson. If Officer Perrin only stopped his car because he saw Ty and had not witnessed any interaction between Ty and Mr. Johnson, Officer Perrin would have approached Ty in the hopes of recovering contraband. Instead, Officer Perrin ran past Ty in pursuit of Mr. Johnson. Additionally, after Mr. Johnson is handcuffed, Officer Perrin says to his sergeant, "I want Ty—that's who he was giving it to," referring to Mr. Johnson as the actor. At this point, having just engaged in a strenuous prolonged arrest, Officer Perrin had no reason to fabricate what he had seen and there was little time for him to reflect and edit his story for the benefit of the body-worn camera footage. Thus, this contemporaneous statement is

significant corroboration of Officer Perrin's observations of a transaction between Mr. Johnson and Ty.

And fifth, the actions of civilians nearby corroborate Officer Perrin's version of events. As described above, Ty can be seen holding something in the body-worn camera footage, consistent with Officer Perrin's testimony of having just witnessed Mr. Johnson pass something to Ty. Even more convincingly, the bystander in a blue jacket purposefully grabbed and removed the black bag from Mr. Johnson's left pocket while Mr. Johnson resisted being placed in handcuffs. This intentional action demonstrates that the bystander knew Mr. Johnson had the black bag on his person and also knew the bag contained illegal narcotics—knowledge he would have gained from recently witnessing a drug transaction between Mr. Johnson and Ty.

When contrasted with this ample corroborative evidence, the suggestion that Officer Perrin could not physically have seen the transaction is unpersuasive. Officer Perrin was certainly texting while driving, but he was also driving while texting, thus paying attention to his surroundings. The distance from the York Road median to the spot where the group was later seen standing is 88 feet, but Officer Perrin's testimony describes Ty and Mr. Johnson initially closer to York Road. It was evening with the street in shadow, but from the body-worn camera footage, it is still light enough that one can clearly identify people, items, and actions. In the circumstances described, Officer Perrin credibly could have observed Mr. Johnson's movements.

Additionally, the Defendant's attempts to discredit and impeach Officer Perrin are unavailing. Officer Perrin's record with the Baltimore Police Department suggests some inability to consistently follow administrative protocols, but it does not reflect a pattern of untruthfulness.

*See* ECF 63. And any questions that Officer Perrin's history might create as to his credibility are alleviated by the corroboration described above.[5]

Accordingly, this Court credits Officer Perrin's testimony that he witnessed a suspected hand-to-hand transaction between Mr. Johnson and Ty while driving past the 500 block of Richwood Avenue on March 29, 2021.

## C. Reasonable Suspicion

Mr. Johnson and the Government dispute whether Officer Perrin had reasonable suspicion to justify his investigatory stop.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Generally, warrantless searches, *i.e.*, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is an investigatory stop where the officer

---

[5] Aside from prior violations of Baltimore Police Department protocols, the Defendant notes that Officer Perrin violated the Court's sequestration order and ate with Detective Burke during the motion hearing's lunch break. Despite this violation, there is no evidence that Officer Perrin discussed his testimony or the case with Detective Burke, rendering the violation immaterial. Defendant also notes that Officer Perrin's testimony included details not originally set forth in his report, such as his belief that Mr. Johnson moved in a "clandestine" manner. However, these supplemental details are not contradictory with his reports; therefore, they do not successfully impeach his credibility. Finally, the Defendant highlights that Officer Perrin did not turn on his body-worn camera until he began running down the street, although Baltimore Police Department policy requires officers to turn on their cameras as soon as they observe reasonable suspicion. Thus, Defendant argues that this delay demonstrates that Officer Perrin did not actually observe a hand-to-hand transaction. This Court is not persuaded by this argument. Upon review of the camera footage, the delay was more likely due to Officer Perrin simultaneously driving the car (with his phone in his hand) and having to quickly perform a U-turn. Any earlier activation of the camera would have seemed physically impossible.

has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Ruffin*, 814 F. App'x 741, 746 (4th Cir. 2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, such stops require only that the investigating officer have 'reasonable suspicion' that 'criminal activity may be afoot.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Though a mere 'hunch' is insufficient to give rise to reasonable suspicion, the proof required to meet this standard is 'obviously less' than necessary to establish probable cause." *Id.* (quoting *Navarette v. California*, 572 U.S. 393, 396–97 (2014)).

"To determine if the officer had reasonable suspicion, courts look to the totality of the circumstances." *United States v. Drakeford*, 992 F.3d 255, 263 (4th Cir. 2021) (quoting *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016)) (internal quotation marks omitted). "Seemingly innocent factors, when viewed together, can amount to reasonable suspicion." *Id.* But, "the presence of additional facts might dispel reasonable suspicion." *Id.* (quoting *Kansas v. Glover*, __ U.S. __, 140 S. Ct. 1183, 1191 (2020)) (internal quotations marks omitted). "Accordingly, the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." *Id.* (quoting *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016)) (internal quotation marks omitted).

Here, the Government argues that Officer Perrin had reasonable suspicion to conduct an investigatory stop of Mr. Johnson for several reasons: (1) the suspected hand-to-hand drug transaction, (2) in a high-crime area, (3) to an individual known to have a history with CDS transactions, and (4) unprovoked flight. Taken together, these circumstances amounted to reasonable suspicion.

Courts have held that the observation of a suspected hand-to-hand drug transaction in a high crime area can generate reasonable suspicion. *E.g.*, *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010) (finding reasonable suspicion when observing quick hand-to-hand contact with three men in a high-crime area). In fact, many courts have found probable cause as to a suspected drug transaction in a high-crime area, based on the totality of circumstances, even when a police officer was not actually able to see the object transferred. *United States v. Blue*, No. 11-0508, 2015 WL 877729, at *14 (D. Md. Feb. 27, 2015) (collecting cases). Here, Officer Perrin witnessed a "clandestine" hand-to-hand transaction between Mr. Johnson and an individual known to engage in CDS transactions, while located in a high-crime area. These circumstances, taken together, raise sufficient suspicion of illegal activity.[6]

In response, Mr. Johnson points to a Fourth Circuit case, *United States v. Drakeford*, 992 F.3d 255, 263 (4th Cir. 2021), which reversed a district court's finding of reasonable suspicion based on an officer's conclusory testimony of having witnessed a suspected hand-to-hand drug

---

[6] The parties dispute whether the intersection of York Road and Richwood Avenue is a "high-crime area." The Government presented testimony of Officer Perrin about information he obtained from his supervisors and a report by the Baltimore Police Department identifying this specific block as a "micro zone" for high rates of crime. *See supra* note 3. In contrast, Defendant pointed to a local university, cultural centers, and single-family homes located within a mile of the intersection.

"[T]he fact that the stop occurred in a 'high crime area' is among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Based on the Government's evidence, this Court finds that the 500 block of Richwood Avenue was known to Officer Perrin at the time of the stop to have high rates of crime. However, even if this Court disregards the nature of the area, Officer Perrin had sufficient reasonable suspicion. Officer Perrin witnessed a hand-to-hand transaction, conducted in a clandestine manner, involving an individual Officer Perrin knew to have a history of engaging in street-level CDS transactions. Once Officer Perrin exited his car, Mr. Johnson was the only individual to flee. These specific observations, irrespective of the location's character, sufficiently generated reasonable suspicion to justify an investigatory stop.

transaction. As with this case, the officer in *Drakeford* never witnessed drugs or money change hands. *Id.* at 264. Aside from this similarity, however, *Drakeford* is distinguishable. There, the Fourth Circuit concluded that many other mitigating factors should have dispelled the officer's suspicion of illegal activity. For example, the suspected drug transaction in *Drakeford* did not occur in a high crime area, but rather, it took place in a busy public parking lot in broad daylight and in front of a security camera. After the suspected drug transaction, the defendant proceeded to go into the public store and "conduct a normal shopping trip." *Id.* at 265. Thus, the Fourth Circuit concluded that the totality of the circumstances did not create reasonable suspicion sufficient to justify an investigatory stop. *Id.*

For the present case, Mr. Johnson points to circumstances that he argues corroborate his version of the story, such as the Styrofoam drink cup on the roof of the car and the white carryout bag hanging from his right arm. He also notes that the seized bills were large denominations folded together (such as one-hundred dollar bills), suggesting that he had not recently received money in exchange for a small transaction, and that the black bag contained a mixture of contraband which was not conducive for quick hand-to-hand transactions. And he suggests that Ty would not have continued to hold narcotics in his cupped hand openly after the officers came into the block. None of these facts undermines Officer Perrin's initial observation, as he did not see Ty hand money to Mr. Johnson and as there is no evidence as to the nature of what Mr. Johnson actually conveyed to Ty. As to Mr. Johnson's description of his activities immediately before Officer Perrin approached, both versions of events could co-exist: Mr. Johnson could have returned from obtaining takeout, placed the cup on the car, and handed something to Ty in a manner sufficient to generate reasonable suspicion. Ultimately, this Court need not determine that drugs were actually handed to Ty. Even had Mr. Johnson handed Ty a small piece of carryout chicken, the officer

would have reasonable suspicion for the stop based on his observations of a seemingly clandestine exchange, his history with Ty, and Mr. Johnson's flight. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

Upon considering the totality of the circumstances, Officer Perrin had ample reasonable suspicion to warrant an investigatory stop. Given the amount of force was reasonable to effectuate the stop, as discussed above, there was no Fourth Amendment violation in the stop and eventual arrest of Mr. Johnson.

### III. CONCLUSION

For the reasons stated above, Mr. Johnson's Motion to Suppress Tangible Evidence, ECF 40, will be denied.  A separate Order follows.


Dated: February 8, 2023                                          /s/
                                                      Stephanie A. Gallagher
                                                      United States District Judge